**BLINDERMAN CONSTRUCTION CO., INC., Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 53–82.**

United States Court of Appeals, Federal Circuit.

Dec. 10, 1982.

David I. Abse, Warrenton, Va., argued for appellant.

Lynn Bush Ferguson, Washington, D.C., argued for the United States. With her on the briefs were Asst. Attys. Gen. J. Paul McGrath and Patrick J. Martell, Washington, D.C.

Before SMITH, Circuit Judge, COWEN, Senior Circuit Judge, and NIES, Circuit Judge.

COWEN, Senior Circuit Judge.

Pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601, *et seq.*, the appellant (contractor) appeals from a decision of the Armed Services Board of Contract Appeals (Board) which denied, in part, the contractor's claim in the amount of $45,312, and its request for a time extension of 13 days for the completion of the contract. The case is before us on cross-motions for summary judgment filed in the United States Court of Claims prior to October 1, 1982, and thereafter transferred to this court.

The claim grows out of a contract entered into between the contractor and the Department of the Navy (Navy) for installation of permanent improvements in multi-family housing at the Great Lakes, Illinois Naval Base (Base).

The claim of $45,312, includes three separate items.

The first item was a claim for extra costs in the amount of $803.40, due to a delay resulting from a power outage on July 26, 1978. The Board allowed the contractor an equitable adjustment of $1,476.59 on this claim. The allowance included the direct costs plus additions made by the Board. This claim is not in issue.

The second item was a claim for $617.40 for additional costs allegedly caused by a power outage on August 18, 1978. The contractor appeals from the denial of this claim and we affirm the Board's decision thereon.

The third and largest item is for damages sought for what the Board refers to as a

claim for "access delays," and a time extension of 13 days. The contractor contends that the additional expense and delay were incurred by reason of the Navy's failure to discharge its contractual obligation to provide access to apartments occupied by Naval personnel. A summary of the claim of $45,312 shows that it includes an item of $11,579 for "delay costs," and $33,733 claimed on the ground that the impact of the delays was to extend the completion of the project by 9 working days.[1]

The claim for access delays involves an interpretation of the provisions of the contract, and for the reasons to be set forth, we disagree with the Board's interpretation and reverse its decision on this question of law. However, in view of its holding, the Board did not decide whether or to what extent the Navy's delay was unreasonable. Also, at oral argument, Government counsel stated that if we disagreed with the Board, the case should be remanded because of concurrent delays attributable to the contractor and its subcontractor. We agree, and therefore we deny both motions for summary judgment, except as stated above, and remand the case to the Board for further proceedings in accordance with this opinion.

### I. *Factual Background and Prior Proceedings.*

By contract dated March 31, 1978, the contractor was required to furnish and install electrical meters, gas meters, hot water meters, hot water heating meters and condensate meters in the apartments housing Naval personnel at the Base. The contract was to have been completed by September 12, 1978, but the completion date was extended by a change order to October 3, 1978. The contract was let in conformity with the national policy to conserve energy by metering energy usage in military housing. About 139 buildings and 656 individual apartments were involved in the work to be performed.

The contractor was required to provide a quality control inspection system to insure compliance with the contract plans and specifications. The contract contained the standard clauses for construction contracts including "Changes," "Suspension of Work," and "Liquidated Damages". Since the work was not completed until October 20, 1978, the contractor was charged by the Navy with liquidated damages of $2,975 for 17 days of inexcusable delays. On other claims not in issue, the Board found that the contractor was entitled to a time extension of 6 days and remission of liquidated damages in the amount of $1,050; thus the contractor was charged with net liquidated damages of $1,925 for 11 days of inexcusable delays.

Following the adverse decision of the contracting officer, the contractor elected to proceed under the Contract Disputes Act of 1978 and appealed the decision to the Board. The Board denied the claim before us in an initial opinion of November 14, 1980, and then, in an opinion on motion for reconsideration, on February 25, 1981. The cross-motions for summary judgment on the contractor's appeal from the Board's decision were thereafter filed in the United States Court of Claims.

### II. *The Power Outage Claim.*

■ For itself and its subcontractor, the contractor claims it is entitled to recover $617.60 for the time lost by the workmen employed by them during a power outage on August 18, 1978. The Board found that the lost time was caused by rain, rather than by a power outage. The contractor challenges this finding on the ground that it is not supported by the "greater weight of the evidence."

The statutory standard of review is the substantiality of the evidence. On the basis of the testimony of the contractor's superintendent and the subcontractor's superintendent, the Board found that the workmen left the site because of a very heavy rain which prevented them from doing any outside work.

---

1. The Board did not find nor has the contractor shown the net amount of its claim for access delays, after deducting the amounts claimed for the power outage delays of July 26, and August 18, 1978.

The Board's decision on this portion of the claim is supported not only by substantial evidence but by a clear preponderance of the evidence. The contractor's contentions are without merit.

III. *The Claim for Delays in Obtaining Access to the Apartments.*

This claim presents the only difficult issue in this appeal, because its resolution involves an interpretation of the following provisions of the contract:

SCHEDULING OF WORK: Work shall be scheduled to issue [sic] minimum description [sic] of service to the housing units. The contractor shall notify the occupants of the housing unit* at least 3 days prior to commencing any work in a housing unit. The contractor shall perform his work between the hours of 8:00 A.M. and 5:00 P.M. and having once started work in a housing unit shall work to completion in consecutive work days. * * *

In no case shall a unit be left overnight without a completed meter installation, including testing and resumption of gas service.

---

* An amendment to the IFB changed "contracting officer" to "occupants of the housing unit."

PROGRESS CHARTS: The Contractor shall, within 15 days after receipt of notice of award, prepare and submit to the Contracting Officer for approval, a practicable construction schedule in accordance with Clause entitled 'Progress Charts and Requirements for Overtime Work' of the General Provisions except as modified herein. Progress chart shall clearly indicate when the contractor will require access to individual buildings and shall further indicate the anticipated durations of all utility outages.

METHODS AND SCHEDULES OF PROCEDURES: The work shall be executed in a manner and at such times that will cause the least practicable disturbance to the occupants of the buildings and normal activities of the station. Before starting any work, the sequence of operations and the methods of conducting the work shall have been approved by the Contracting Officer.

The facts as found by the Board or which are otherwise established by undisputed evidence,[2] show that the contractor experienced considerable difficulty and delays in gaining access to approximately 60 apartments. After the contractor had prepared and delivered to the Navy a progress chart showing when the contractor required access to the buildings, the contractor's quality control manager (CQC) had the responsibility for notifying the occupants of the time when the work in their apartments was to be performed. The specifications required that this notice be given 3 days before work was to be commenced, and the CQC attempted to notify them personally at least 3 but usually 7 days before the work was to begin.

Notices to the occupants were given in the morning, during the noon-hour, or in the afternoon. If CQC could not reach the occupants during the day, he tried to see them in the evening. If all of these efforts failed, the CQC would, in accordance with a suggestion made by the Navy's project manager, leave a yellow card on the doorknob of the apartment, indicating when the work in that unit would begin. The Navy had, at the site of the work, a project manager who represented the contracting officer in the administration of the contract, and most of the contractor's dealings were with this project manager. In some instances, the occupants refused to permit the contractor's workmen to enter their apartments, even after notice was received by them. At times, the contractor was unable to serve personal notice because the occupants were on military leave for periods for as long as 2 weeks. In other in-

**2.** If [the board] has failed to make a relevant finding of fact, and the evidence relating to fact question is undisputed, [the] court on appeal may make a supplemental finding * *.

*Ordnance Research, Inc. v. United States,* 609 F.2d 462, 221 Ct.Cl. 641 (1979); *Koppers Co. v. United States,* 405 F.2d 554, 559, 186 Ct.Cl. 142 (1968).

stances, the occupants would go out during the lunch hour while the work was being performed, leaving their doors locked with the tools of the workmen inside. On most of the occasions complained of by the contractor, the occupants were not at home when the work was scheduled despite notice given to them in person or by a card left on the doorknob.

Whenever the contractor or the subcontractors were unable to gain access to an apartment for any of the reasons mentioned above, they would call on the project manager to provide the access they needed. If the occupants could be contacted by telephone, the project manager would ask them to return home and permit entry into their apartments. If the occupants were absent from the apartment on vacation, the project manager first telephoned them to get permission to enter their apartments. Then he would obtain keys from the Housing Section at the Base to admit the workmen. Thus on occasion, access by the workmen could not be obtained until several days after the scheduled date for commencing work. The workmen were carpenters, plumbers, pipefitters, electricians, and laborers, and their work had to be coordinated and performed in a planned sequence. Because of the delays, they would have to leave buildings with work unfinished in several apartments and work in another building. To complete the contract, they would have to backtrack to those apartments which they were unable to enter during the time previously scheduled for the work.

Shortly after experiencing delays for lack of access to the apartments, the contractor notified the project manager that the contractor's responsibilities ended after it had notified the occupants in the manner described above; that a record would be kept of the delays, and that a claim would be submitted later for the increased costs incurred as a result of such delays.

As previously stated, the contractor gave the project manager notice that claims would be submitted for the increased costs due to the delays in getting access to the apartments. On December 1, 1978, after the contract had been completed, the contractor submitted to the project manager the claim in issue. Attached thereto was an itemized breakdown of the dates and extent of the delays. The project manager, by letter of December 22, 1978, took a position that was inconsistent with his conduct during the performance of the contract. He stated that the claimed delays were due to the failure of the contractor to notify the occupants as required by the specifications, and that placing cards on doorknobs of the housing units did not constitute notification, because the occupants could have been on leave at the time. He also denied that the Navy had any responsibility for assisting the contractor to obtain access to the apartments.

At the contractor's request, the claim was submitted to the contracting officer, who agreed with the project manager and denied the claim by written "final decision."

During his testimony before the Board, the project manager gave his interpretation of the provisions of the specifications which have been quoted above. He testified that the "Scheduling of Work" provision required the contractor to give actual notice to the individual occupants, and that the contractor was obligated to obtain an agreement with each occupant for the performance of work in that particular apartment. It also was his view that if the tenant refused access, no agreement had been reached and the contractor had not complied with the specifications. He further stated that the contractor's responsibility to gain access to each apartment never terminated.

On appeal, the contractor argued before the Board that the 150-day completion schedule, the provision for liquidated damages, the specification limiting work hours, and the requirement for the contracting officer's approval of the construction schedule and sequence of the work, implied a duty on the part of the Navy to make the apartments in the buildings available in accordance with the schedule and sequence of work which had been approved by the project manager.

In its opinion, the Board noted that the invitation for bids had originally provided that the contractor would notify the contracting officer at least 3 days prior to commencing work in any unit, but that this requirement was amended to state that the notification was required to be given by the contractor to the occupants of the housing units. The Board concluded that the necessary implication of this change was that "the contractor, and not the Navy, was obliged to make arrangements with each tenant as to the specific time work would start and any necessary preparations by the tenants in each apartment." Thus, the Board essentially adopted the project manager's view that the specifications required the contractor, not only to give notice to the occupants, but also to obtain in each case, an agreement permitting entry into the individual apartments, specifying the time for the work, and covering necessary preparations by the occupants.

The Board's holding on this crucial issue is a decision on a question of law, which is not final or conclusive on judicial review. 41 U.S.C. § 609(b). It is with this conclusion of law that we disagree.

The Government has correctly observed that this is not a case in which the Government expressly contracted to provide access to the premises to perform the contract work, as in *Delta Equipment & Constr. Co. v. United States,* 104 F.Supp. 549, 122 Ct.Cl. 340 (1952). Nor is it a case like *Broome Constr., Inc. v. United States,* 492 F.2d 829 (Ct.Cl.1974), and similar cases where the courts have held that the contractor is not entitled to an adjustment under the "Suspension of Work" clause where the claimed delays were due to the acts of another contractor or to bad weather.

■ The answer to the question is not free of doubt. However, after considering the language of the specifications and other pertinent facts and circumstances, we conclude that there should be applied here the rule enunciated in *Worthington Pump & Machinery Corp. v. United States,* 66 Ct.Cl. 230, 240 (1928) and *Edward E. Gillen Co. v. United States,* 88 Ct.Cl. 347, 368 (1939). Therefore, we hold that the contractor complied with the "Scheduling of Work" provision by giving as much notice as was reasonably required by that provision. After the contractor notified the project manager that the contractor's reasonable efforts had not resulted in gaining entry to certain apartments, the Navy was under an implied obligation to provide such access so that the contractor could complete the contract within the time required by its terms. Consequently, if any part of the contractor's work was thereafter delayed for an unreasonable period of time because of the Navy's failure to provide access to the apartments, the contractor is, under the "Suspension of Work" clause,[3] entitled to an increase in the cost of performing the contract. *Chaney and James Constr. Co. v. United States,* 421 F.2d 728, 190 Ct.Cl. 699 (1970). We have reached this conclusion on several grounds.

■ We find that if their ordinary meaning is attributed to the words used in the "Scheduling of Work" provision, there is simply nothing in that specification or elsewhere which states that the contractor is required to make an arrangement with or obtain an agreement from each apartment occupant as the Board decided.

**3.** 17. SUSPENSION OF WORK (1968 FEB)

(b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted by an act of the Contracting Officer in the administration of this contract, or by his failure to act within the time specified in this contract (or if no time is specified, within a reasonable time) an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by such unreasonable suspen-

sion, delay, or interruption and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent (1) that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor or (2) for which an equitable adjustment is provided for or excluded under any other provision of this contract.

It was reasonable for the contractor to interpret this provision of the specifications to relieve it of further responsibility to notify the occupants after reasonable efforts to give the notice had been exhausted. If the Government had intended the specifications to convey an intent to require the contractor to make an agreement covering the matters found by the Board with each of the 656 occupants, the drafters of the specifications wholly failed to convey this meaning. Therefore, the provision must be construed against the Government. *Troup Bros., Inc. v. United States,* 643 F.2d 719, 224 Ct.Cl. 594 (1980); *Singer-General Precision, Inc. v. United States,* 427 F.2d 1187, 192 Ct.Cl. 435 (1970); *Jefferson Constr. Co. v. United States,* 151 Ct.Cl. 75 (1960).

■ The conduct of both parties during construction and before the contractor's claim was submitted to the project manager provides persuasive evidence that the contract should be construed as urged by the contractor. Although the Board refers to the assistance given by the project manager as "cooperation," our study of the record reveals that the project manager recognized the obligation of the Navy to provide access to the apartments when it could not be obtained by the contractor. The Navy knew when the contract was entered into that it would be impossible for the contractor to gain access when the occupants refused to admit the workmen, or when the occupants were on leave and their whereabouts were unknown to the contractor. The record supports the conclusion that the project manager realized that in such circumstances, it would be necessary for the Navy to provide the necessary access in order to enable the contractor to complete the work within the time required by the Navy. It is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight in its interpretation. *State of Arizona v. United States,* 575 F.2d 855 (Ct.Cl.1978).

■ The Board relied on the "admission" of the contractor's quality control manager that the contractor was responsible for scheduling the work without assistance from the Navy. Although the witness agreed (Tr. 107) that the specifications required the contractor to schedule the work without assistance from the Navy, this is a far cry from an admission that the contractor was required to obtain an agreement or to make an arrangement with each tenant for performing the work in his apartment.

The apartments were located on a Navy base, and the rights of the occupants were subject to rules and regulations that may have been promulgated by the Navy.[4] In his testimony before the Board, the project manager stated that no official of the Navy had authority to enter the apartments except in the event of such emergencies as fire, or flooding of the unit as a result of broken pipes. However, the Navy did not, in the solicitation for bids or at any other time before work commenced, inform the contractor of the Navy's limited right to enter the apartments. The contractor did not foresee that it would encounter all the delays described above in gaining access to the apartments. The record shows that approximately 1½ years before this contract was entered into, the contractor had completed a project involving some of the same buildings on the same Base. The work involved an overhauling of the kitchens. In that instance, when the contractor was unable to notify the individual occupants, the Navy was informed to that effect and promptly provided access to the apartments.

We do not hold that the contractor was justified in believing that it would encounter no difficulty in notifying the occupants when the work would begin. However, the evidence shows that in view of the contractor's previous experience on the same base, it believed the Navy would provide access to the apartments when such difficulties arose.

---

4. The contractor has attached to its reply brief copies of regulations setting forth the conditions under which the occupants were permitted to use the apartments. However, these regulations were not in evidence before the Board, and we do not consider them here. [Appellant's Reply Brief, Exh. 1]

## IV. The Contractor's Right to Recover Damages.

Our holding with respect to the Government's liability should not be construed as a decision that the contractor is entitled to recover the increased costs it claims were incurred because of lack of access to the apartments. In view of its interpretation of the contract, the Board made no finding on the extent of the Government's unreasonable delay or on the issue of damages. As previously stated, Government counsel at oral argument contended that if we disagreed with the Board on the access claim, the case should be remanded because of concurrent delays attributable to the contractor and its subcontractor.

The Board found that:

> The mechanical subcontractor needed 20 workers to do the mechanical work required in the time allowed. It was never able to hire that many workers. That labor shortage, in part, caused the subcontractor to fall behind schedule and required it to hire Hans Jensen to do some of the mechanical work.

This finding is supported by substantial evidence.

■ Where both parties contribute to the delay "neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party." *Coath & Goss, Inc. v. United States,* 101 Ct.Cl. 702, 714–15 (1944); *Commerce International Co. v. United States,* 338 F.2d 81, 90, 167 Ct.Cl. 529 (1964).[5]

■ Generally, courts will deny recovery where the delays are "concurrent or intertwined" and the contractor has not met its burden of separating its delays from those chargeable to the Government. However, the concurrent delay issue was not briefed by either party in this case and the contractor should be given the opportunity, on remand, to discharge that burden before the Board. This is also appropriate because the Board, in view of its holding on the access claim, did not consider whether the contractor was entitled to a time extension in connection with that claim for delays chargeable to the Navy.

## V. Conclusion.

For the reasons stated, the Board's decision involving the power outage of August 18, 1978, is affirmed, but its decision on the access claim is reversed. With these exceptions, both motions for summary judgment are denied and the case is remanded to the Board to make such findings of fact and conclusions of law as will enable it to determine: (1) whether and to what extent any part of the contractor's work was unreasonably delayed by the Navy's failure to provide access to the apartments; (2) whether any unreasonable delays caused by the Navy were concurrent with or separate from delays due to the subcontractor's shortage of labor or other delays chargeable to the contractor, and (3) whether the contractor is entitled to a time extension and/or a recovery of damages and if so, how much.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

5. *See* 338 F.2d n. 11, at p. 90 for a collection of many corroborating precedents.