**GILBANE BUILDING COMPANY**

**v.**

**The UNITED STATES.**

**No. 414–58.**

United States Court of Claims.

June 12, 1964.

Alan P. Cusick, Providence, R. I., for plaintiff.

Alfred H. O. Boudreau, Jr., Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

WHITAKER, Judge.

Plaintiff sues for damages alleged to have been incurred by a delay in the delivery of the site upon which it had contracted to erect a transit shed. The question presented is whether the Government guaranteed the availability of the site by any particular time.

In its contract, plaintiff agreed to build a warehouse, a transit shed [1] and related utilities systems at the Naval Supply Depot in Newport, Rhode Island. The warehouse was to be built on existing land, but, at the time the contract was signed, the site where the transit shed was to be erected was an arm of Narragansett Bay. As plaintiff's contract specified, the site was to be filled in by another contractor, the Raymond Concrete Pile Company (hereinafter referred to as "Raymond"). Plaintiff's contract stated that Raymond would complete the fill and that the site would be ready for plaintiff on November 22, 1954.

However, Raymond was delayed in preparing the site, principally on account of two major hurricanes that swept through the area in October and November of 1954 and by the necessity for complying with change orders necessitated in part by the hurricanes' havoc. As a consequence, the site was not ready for plaintiff to begin building the transit shed until late in the spring of the following year,[2] and plaintiff did not actually commence operations on it until June 1, 1955.

The damages that plaintiff claims stem entirely from this delay in delivery of the transit shed site. In its petition and its opening statement at the trial, plaintiff asserted a cause of action based upon a stop order that defendant issued, an order which prevented plaintiff from doing any work on the transit shed from June 28, 1955 to July 20, 1955. The purpose of issuing the stop order was to permit the Government to alter the specifications to meet an unexpected soil condition, which, it would seem, it had a right to do under its reserved power to make changes. In its brief, plaintiff did not further press this claim, and we have assumed that it has been abandoned. Plaintiff did not make an oral argument, having elected to submit the case upon its brief.

The trial commissioner has found that none of the delay in filling in the site can be attributed to any fault or negligence on defendant's part, which is fully supported by the evidence.[3]

1. A transit shed is a building that is located at the water's edge upon a wharf and is used for the temporary storage of supplies offloaded from or intended for loading onto vessels moored at the wharf. The particular structure involved in this case was a one-story building with a structural steel frame, side walls of precast concrete slabs and a metal roof. It had a floor area 302.6 x 101.33 feet.

2. By a letter dated May 4, 1955, the Assistant to the Resident Officer in Charge of Construction notified plaintiff that the transit shed area "is ready for the start of your work." Plaintiff's reply, sent two days later, asserted that Raymond was still at work in the area and declined to begin work until Raymond's work force had left it. On May 17, 1955, the Assistant to the Resident Officer advised plaintiff in writing that, in the opinion of the Government, Raymond's remaining operations would not interfere with plaintiff, and that plaintiff should consider the area as available. Plaintiff again protested that it could not begin until Raymond was completely finished and its personnel had vacated the site. On May 31, 1955, defendant's representative advised plaintiff that the entire area had been completed. Plaintiff confirmed this on the following day. The dispute as to the exact date when plaintiff could have begun its work on the transit shed was never resolved by the parties. In view of the result we reach, we do not undertake to do so in this opinion.

3. The evidence also shows that plaintiff was itself responsible for delays in constructing the warehouse, a building which was more than five times as large as the transit shed. It had planned to begin

The issue then is, whether defendant is liable for Raymond's delay even though it did not wrongfully cause it. Such liability, if it exists at all, must be found in the express language of the contract; it cannot arise solely by implication. As the Supreme Court said in H. E. Crook Co. v. United States, 270 U.S. 4, 46 S.Ct. 184, 70 L.Ed. 438 (1926), the seminal case in this area, it is not within the realm of normal expectation that the Government would voluntarily stand as a guarantor of the performance of his contract by another contractor within the specified time. To the same effect are United States v. Rice, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1942), and United States v. Foley, 329 U.S. 64, 67 S.Ct. 154, 91 L.Ed. 44 (1946).

These cases involved the standard form of government construction contract, quite similar to the one involved here. In the Rice case, the Supreme Court concluded its discussion of this feature of the case with these words, at page 65 of 317 U.S., at page 123 of 63 S.Ct.:

> "Decisions of this Court prior to the Crook case also make it clear that contracts such as this do not bind the government to have the property ready for work by a contractor at a particular time. Wells Bros. Co. v. United States, 254 U.S. 83, 86 [41 S.Ct. 34, 35, 65 L.Ed. 148]; Chouteau v. United States, supra [95 U.S. 61, 24 L.Ed. 371 (1877)]; cf. United States v. Smith, 94 U.S. 214, 217, 24 L.Ed. 115."

In Foley, an electrical contractor was delayed because the dredging contractor was delayed in filling in the site for the Washington National Airport, and did not have it ready on time, which delayed the electrical contractor in installing lights along the runways. The Supreme Court said, at page 67 of 329 U.S., at page 155 of 67 S.Ct.:

> "* * * the Government cannot be held liable unless the contract can be interpreted to imply an unqualified warranty to make the runways promptly available.
>
> "We can find no such warranty if we are to be consistent with our Crook and Rice decisions, supra. * * *"

Plaintiff relies on paragraph 1–26 of the specifications to show the defendant did warrant that the site would be available at the specified time. It reads:

> "*Preparation of Transit Shed Site.* The installation of steel sheet bulkhead and the fill in the Transit Shed Area is being accomplished under another contract and will be completed and the site available to commence the work specified under this contract on November 22, 1954. The work to be performed under this contract in the Transit Shed Area shall be scheduled with due consideration given to the date of availability of the site and completion within the time stipulated in subsection 1–06 'Time for Completion.'"

These are not words of warranty. The defendant represented that the site would be available at a specified time, but it did not guarantee that it would be. Other provisions of the contract and specifications show that it was expected that it might not be. Paragraph 1–07 of the specifications, entitled *Damages for Delay,* provides in part:

> "* * * if the site preparation work at the Transit Shed area under contract NOy 73788 is delayed to such an extent that the contractor

work on the warehouse on June 27, 1954, to start the transit shed on November 22, 1954, and to complete both buildings on December 21, 1955, within 540 days which the contract permitted for the entire project. In actuality, however, the transit shed was not completed until July 1956 and the work on the warehouse continued until October of that year, when the Navy accepted both buildings. Despite the delay in starting the transit shed, therefore, its construction took the the same length of time (13 months) that plaintiff had foreseen it would. Defendant granted extensions of time to both plaintiff and Raymond sufficient to eliminate any claim for liquidated damages.

is unable to complete the work within the time specified, the delay will be considered an act caused by the Government, and as such will be excusable within the meaning of clause 5."

Clause 5(c) of the General Provisions of the contract reads as follows:

"The right of the Contractor to proceed shall not be terminated, as provided in paragraph (a) hereof, nor the Contractor charged with liquidated or actual damages, as provided in paragraph (b) hereof because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the Contractor, including, but not restricted to, acts of God, or of the public enemy, *acts of the Government,* either in its sovereign or contractual capacity, *acts of another contractor in the performance of a contract with the Government,* fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, or delays of subcontractors or suppliers due to such causes: *Provided,* That the Contractor shall within 10 days from the beginning of any such delay, unless the Contracting Officer shall grant a further period of time prior to the date of final settlement of the contract, notify the Contracting Officer in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of the delay and shall extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal as provided in Clause 6 hereof [the disputes clause]." [Italics added.]

These two provisions show that delays in the preparation of the site were in contemplation of the parties, and, hence, disprove the assertion that defendant guaranteed that it would be ready on the completion date fixed in the contract for filling in the site.

In both the Rice and Foley cases the defendant had given the contractor notice to proceed, although the prior work was not in condition for him to proceed, and still the Supreme Court held the defendant was not liable for the incident delay. *A fortiori,* defendant is not liable in this case.

The type of work involved in the Raymond contract was peculiarly susceptible of being delayed, and both parties must have realized it. The dredging and filling of land out of an arm of the Atlantic Ocean is not an operation the duration of which can be ascertained in advance with great precision. We must also bear in mind that the locale of this project was an area frequently subject to heavy weather. In these circumstances, the defendant would not have been likely to assent to a firm date for the availability of the site and to guarantee that date, absolutely and in all events.

This view is in accord with our opinion in Stafford v. United States, 74 F. Supp. 155, 109 Ct.Cl. 479 (1947), where we refused to hold the Government liable for a contractor's increased costs after he had been delayed in starting work. There, the delay was found to have resulted from a labor dispute that had prevented another contractor from completing the site upon which plaintiff had contracted to plant nursery stock on the date the contract said plaintiff was to start. See also Kehm Corp. v. United States, 93 F.Supp. 620, 119 Ct.Cl. 454 (1950).

We therefore hold that plaintiff is not entitled to recover and its petition is dismissed.