NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**ECC INTERNATIONAL CONSTRUCTORS, LLC,**
*Appellant*

**v.**

**SECRETARY OF THE ARMY,**
*Appellee*

_____

2019-1619

_____

Appeal from the Armed Services Board of Contract Appeals in Nos. 59138, 59586, 59643, 60284, Administrative Judge Owen C. Wilson, Administrative Judge Richard Shackleford, Administrative Judge Timothy Paul McIlmail.

_____

Decided:  June 5, 2020

_____

ROY DALE HOLMES, Cohen Seglias Pallas Greenhall & Furman, Philadelphia, PA, for appellant.  Also represented by MICHAEL H. PAYNE.

JESSICA R. TOPLIN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for appellee.  Also represented by JOSEPH H.

HUNT, ROBERT EDWARD KIRSCHMAN, JR., PATRICIA M. MCCARTHY.

———————————

Before LOURIE, LINN, and WALLACH, *Circuit Judges.*

LINN, *Circuit Judge*

ECC International Construction, LLC ("ECC"), the holder of Contract No. W912ER-10-C-0054 ("contract") awarded under Solicitation No. W912ER-10-R-0062 ("solicitation") for the design and construction of a Special Operations Facility Joint Operations Center ("JOC"), appeals the decision of the Board of Contract Appeals ("Board") granting summary judgment in favor of the Army and denying ECC entitlement to additional compensation for costs and delays incurred in meeting heightened "inside the wire" security procedures imposed by the operator of a nearby International Security Assistance Force military base ("Base") after it expanded the perimeter of the Base to envelop the JOC construction site. *See Appeals of ECC Int'l Constructors, LLC*, ASBCA No. 59138, 19-1 BCA ¶ 37252, 2019 WL 495998 (Jan. 24, 2019). Because the Board correctly concluded that the change in security procedures was not a constructive change in the contract for which ECC is entitled to compensation, we affirm.

I

It is undisputed that the operator of the Base is a third party and that the Base expansion was the act of that third party and not the government. As the Board recognized, the government is not liable under contract for increased costs caused by acts of a third party absent the breach of an unqualified warranty that would amount to a constructive change in the agreed terms. Such liability exists only where "the parties in unmistakable terms agreed to shift the risk of increased costs [to the government]." *Oman-Fischbach Int'l (JV) v. Pirie*, 276 F.3d 1380, 1385 (Fed. Cir. 2002).

Paragraph 1.2 of the contract states that the JOC "will be sited at Mazar-e-Sharif, Afghanistan, on a dedicated area located outside the perimeter fencing of the existing base." J.A. 70. This is confirmed by Solicitation Drawing C-1. Paragraph 1.2 merely describes the location of the building site. It does not warrant the security procedures that will apply to the site.

Paragraph 1.2 also does not limit the reading of ¶ Y of the contract. Paragraph Y explicitly provides that "Base security [the operator of the Base] maintains the ultimate authority for establishing, monitoring, and enforcing security requirements for the work site," and that "[t]he Contractor shall be responsible for compliance with all Base security requirements." J.A. 215. ECC argues that "work site" in this provision only applies to work sites within the Base. That limitation, however, nowhere appears in the contract. Moreover, limiting ¶ Y in that way would render it superfluous in light of special clause SC 1.53 of the contract, which states that "Base Security maintains the ultimate authority for establishing, monitoring, and enforcing security requirements . . . on the Base." J.A. 74; *see also* Appellant's Reply Br. at 6–7 (arguing that SC 1.53 applies to on-Base sites).

Paragraph X of the contract obligates the contractor to "erect a temporary security fence around the construction limits of the project" and specifies that "[a]ccess to this secure area shall be controlled by the Contractor's forces." That paragraph is not inconsistent with the requirement of paragraph Y that Base security procedures be followed where and when necessary. The contractor's obligation to control access to the site—either inside or outside the wire—does not grant the contractor the right to determine the security standards or procedures that might apply over the course of the contract. Nothing in that paragraph creates an implied or express warranty that the work site would not be subject to Base security procedures until ECC decided it would be so.

Further, requiring that the contractor "shall sequence construction to complete the majority of the work outside the base perimeter fence before cutting the base perimeter fences" also does not warrant that the Base security procedures would not apply to the work site, or that the *Base* perimeter would not expand. It merely governs the *Contractor's* sequencing of its work. This provision is wholly consistent with ¶ Y's vesting of ultimate authority for security procedures with the operator of the Base.

The Board did not err in finding no meaningful distinction between this case and *Oman-Fischbach*. In *Oman-Fischbach*, the mere fact that the contract depicted several routes to a disposal site on a map did not explicitly assure the contractor of access to any particular route. *Oman-Fischbach*, 276 F.3d at 1384–85. Here, ECC's contractual responsibility to enforce security procedures on the work site did not unmistakably give it the right to determine the particular security procedures applicable thereto or the timing of when the work site might be brought within the *Base* perimeter fence and subject to heightened security procedures. This case, like *Oman-Fischbach*, is distinguishable from *D&L Construction*, where "[t]he contract provided that defendant would make available to plaintiff existing off-site improvements, such as existing streets," and where the contracting officer sent contractor a letter on the same day that the contract was executed, indicating that the United States "will provide suitable access and means of ingress and egress to and from the subject project." *D&L Const. Co. & Assoc. v. United States*, 402 F.3d 990, 997 (Ct. Cl. 1968). This case is also distinguishable from *J.E. McAmis*, where the contract included drawings showing haul routes, one of which explicitly required the use of designated roads and stated that "all designated access roads will be maintained for permanent access." *In re J.E. McAmis, Inc.*, ASBCA No. 54455, 10-2 B.C.A. (CCH) ¶ 34607, 2010 WL 4822734 (Nov. 18, 2010). There are no similar provisions in the contract at issue here.

## II

In a series of chain cites, ECC argues that parole evidence in the form of the parties' contemporaneous communications reflects the parties' understanding that the government warranted that the Base safety procedures would not apply to the JOC site. The Board did not err in not considering these communications. First, as explained above, the contract unambiguously stated that the operator of the Base maintained ultimate authority for security. *See Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004) (noting that we do not consider extrinsic evidence to interpret a contract or solicitation if the provisions "are clear and unambiguous"). Second, the cited communications occurred after the circumstances giving rise to this dispute. The parties entered into the Contract in 2010, but the cited communications are from 2012 when the Base expansion was in progress. ECC's cases indicate that the relevant time frame for determining the scope of the contract warranties is *before* the changes that gave rise to the dispute. *See Russel & Assocs.-Fresno Ltd. v. United States*, 1979 WL 16491 (Ct. Cl. Mar. 9, 1979) (considering the parties' performance of the contract over the first 18 months "before any problems with the HVAC system arose"); *Max Drill, Inc. v. United States*, 427 F.2d 1233, 1240 (Ct. Cl. 1970) ("The interpretation of a contract by the parties to it before the contract becomes the subject of controversy is deemed by the courts to be of great, if not controlling weight."); *Macke Co. v. United States*, 467 F.2d 1323, 1325 (Ct. Cl. 1972) ("[H]ow the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself."). These communications, therefore, do not aid in interpreting whether the government warranted the security procedures at the JOC.

Moreover, nothing in the correspondence indicates that the government would pay ECC for the additional costs arising out of the expansion, or that such payments were

mandated by any warranty in the contract.  At best, the letters indicate that the parties acknowledged that there was a change of circumstance, that ECC was asking for compensation due to this change, and that the government asked ECC for the estimated impact of the changes to the contract.  J.A. 63 (Hayward Dec'l listing the communications); J.A. 98 (Contracting Officer's representative requesting ECC to submit "a quantified request" of how it was affected by the change); J.A. 100 (Contracting Officer's representative noting the interim security policy); J.A. 102–05 (Contracting Officer's representative noting that "everyone here is aware that there will be contractual implications from the security changes"); J.A. 107 (Contracting Officer's representative noting changes in security policy).  Even if considered, the correspondence does not show that the contract included an unmistakable warranty.

We have carefully considered ECC's remaining arguments and conclude that they have no merit.

For the foregoing reasons, we see no error in the Board's grant of summary judgment to the government.

**AFFIRMED**